IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Deborah K. Egolf, ) | |
| ) | C/A No. 6:10-2430-TMC-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on August 8, 2007, alleging that she became unable to work on April 1, 2004. She later amended her alleged onset date to March 20, 2006 (Tr. 98). The application was denied initially and on reconsideration by the Social Security Administration. On June 24, 2008, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Kathleen H. Robbins, Ph.D., an impartial vocational expert, appeared on July 17, 2009, considered the case *de novo*, and on August 11, 2009, found that the plaintiff was

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on July 21, 2010.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

1.  The claimant last met the insured status requirements of the Social Security Act on March 31, 2009.

2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of March 20, 2006, through her date last insured of March 31, 2009. (20 C.F.R. § 404.1571 *et seq.*)

3.  Through the date last insured, the claimant had the following severe impairments: rheumatoid arthritis, osteoarthritis, disorders of the cervical spine, fibromyalgia, depression, anxiety, and posttraumatic stress disorder (20 C.F.R. § 404.1520(c)).

4.  Through the last date insured, the claimant does not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525(d), and 404.1526).

5.  After careful consideration of the entire record, I find  that, through the date last insured, claimant had the residual functional capacity to perform less than the full range of light work as defined in 20 C.F.R. 404.1567(b). I find that claimant could frequently lift 20 pounds and occasionally lift 10 pounds, and sit, stand, and walk for 6 hours, each of an 8 hour work day.  I also find claimant could occasionally climb ladders, ropes and scaffolds, and frequently balance, stoop, crouch, crawl, kneel, and climb ramps and stairs. I further find claimant

was limited to performing simple, routine, repetitive tasks with occasional public interaction.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 416.965).

7.  The claimant was born on October 10, 1962, and was 46 years old, which is defined as a younger individual age 18-49, on the date last insured. (20 C.F.R. § 404.1563).

8.  The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404-1564).

9.  Transferability of job skills is not material to the determination of disability income because using the Medical-Vocational Rules as a frame work supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569 and 404.1569(a)).

11.  The claimant was not under a disability, as defined in the Social Security Act, from March 20, 2006 through March 31, 2009, the date last insured. (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

**APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can

4

perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

On December 31, 2009, the date last insured [2], the plaintiff was 46 years old. She has completed the eleventh grade and has worked as a cashier, a machine operator, a loom cleaner, and a blanket packer (Tr. 27, 80, 100-101, 104).

The plaintiff has received treatment for depression since at least 1998 (Tr. 302-03; 370-71).

In February 2006, the plaintiff presented to James Hanahan, M.D., and reported pain in her right hand and wrist. Dr. Hanahan observed that the plaintiff had tenderness on the right side of her neck; assessed her with anxiety and depression; administered an injection; and prescribed a muscle relaxant and anti-depressant (Tr. 180-81).

In April 2006, the plaintiff returned to Dr. Hanahan and reported shoulder, arm, and neck pain (which the doctor noted was "mild") (Tr. 182-83). After reviewing an MRI of the plaintiff's neck, Dr. Hanahan assessed the plaintiff with degenerative arthritis and compression of the spinal cord in her neck (cervical spondylosis with myelopathy), prescribed a narcotic pain reliever, and referred her for pain management (Tr. 184-85).

In May 2006, the plaintiff presented to Kenneth Marshall, M.D., for evaluation for pain management services. Dr. Marshall observed that a recent MRI showed "probable degenerative change" and a bone spur at the C2 level of her cervical spine, but no nerve root impingement (Tr. 354). On examination, the plaintiff was alert, oriented, and in no acute distress; walked with a normal gait; and got on and off the examination table independently (Tr. 355). Her neck was supple (pliant), with limited rearward extension but otherwise normal range of motion. The plaintiff had full range of motion and intact muscle

---

[2]  In order to qualify for DIB, a claimant must be found to have been disabled on or before the date last insured. *See* 20 C.F.R. § 404.101; *Johnson v. Barnhart*, 434 F.3d 650, 655-56 (4th Cir. 2005).

strength in her shoulders; full range of motion in her elbows, wrists, and fingers; normal muscle strength in her arms (apart from 4+/5 muscle strength in her right tricep); and no impairment of fine gross motor coordination in her hands (Tr. 355).  Dr. Marshall assessed her with neck pain (cervicalgia), a headache, and radiculitis in the upper right arm, and administered a cervical epidural steroid injection (Tr. 354-56).  The plaintiff reported 85 percent improvement after the injection and received a second injection in early June 2006 (Tr. 352).  The following week, the plaintiff told Dr. Hanahan that she was experiencing "moderate" neck/arm pain (Tr. 187).  Dr. Hanahan's examination notes state, "Neck motion, flexion, extension, stiffness, pain," but document normal (+2) deep tendon reflexes in the plaintiff's triceps and biceps (Tr. 187).  Dr. Hanahan continued to prescribe antidepressant and pain medication (Tr. 186-87).

In July 2006, Dr. Hanahan found the plaintiff's condition was "unchanged" (Tr. 188-89).  When the plaintiff returned to Dr. Hanahan in August 2006, he did not note any complaints or examination findings regarding her neck and arms, but did observe that her cognition was "normal." He prescribed non-steroidal anti-inflammatory medication (Tr. 190-91 (*duplicated in part at* Tr. 194)).  In September 2006, Dr. Hanahan noted that the plaintiff had normal cognition and normal motion in her cervical spine.  He prescribed nerve pain medication (Tr. 192-93).

In November 2006, Dr. Hanahan observed that the plaintiff's mood was depressed but made no findings regarding her neck or arms, other than to observe that she was in no acute distress.  He discontinued the nerve pain medication and started her on a muscle relaxer (Tr. 199).  Dr. Hanahan's notes from early 2007 also reflect that the plaintiff was in no acute distress and that she had normal cognition (Tr. 200).  Dr. Hanahan started the plaintiff on Cymbalta (medication used to treat depression, anxiety, and fibromyalgia) and opined that the plaintiff was capable of handling funds in her own interest (Tr. 179, 202; *see also* Tr. 229 (*duplicated at* Tr. 263)).

7

In September 2007, the plaintiff presented to Dr. Hanahan and reported fatigue, a "moderate sudden" headache, neck pain, and moderate depression. On examination, she was in no acute distress, with a healthy appearance, fair grooming, and normal range of motion in her back, neck, and legs. Dr. Hanahan assessed her with "stable" spondylosis (Tr. 203). Later that month, the plaintiff returned to Dr. Hanahan and reported that a narcotic pain reliever was not working (Tr. 204). Dr. Hanahan observed that she appeared anxious but had fair grooming and was in no acute distress. On examination, she had a supple neck and normal cognition. Dr. Hanahan adjusted her medication (Tr. 204 (*duplicated at* Tr. 230, 264)).

In or around October 2007, Dr. Hanahan opined that the plaintiff was depressed and anxious, but had an intact thought process, appropriate thought content, and adequate attention and memory. He further opined that the plaintiff was able to relate and communicate adequately (Tr. 197). Later that month, Dr. Hanahan noted that the plaintiff had a new complaint of soreness in her ribs. On examination, she was in no acute distress with good grooming and normal cognition. Dr. Hanahan found that the plaintiff had tenderness at 16 out of 18 possible trigger points used to assess fibromyalgia. He diagnosed the plaintiff with fibromyalgia and prescribed Neurotonin (also known as Gabapentin) (Tr. 221-22 (*duplicated at* Tr. 231-32)).

In November 2007, the plaintiff presented to Jacquelyn Mouzon, M.D.[3], at Clemson Behavioral Health for an initial evaluation (Tr. 225-26). The plaintiff reported that she had been depressed and anxious "all [her] life," but acknowledged that she had never had any problem holding down jobs. The plaintiff said that Cymbalta originally helped her pain but now seemed less effective and that Neurotonin helped her headaches. On examination, the plaintiff was well-groomed, alert, and fully oriented, with normal speech

---

[3]The plaintiff states that Dr. Mouzon holds a Ph.D. (pl. brief at 5); however, Dr. Mouzon signed documents as a M.D. (*see* Tr. 223-24).

rate, tone, and volume; goal-directed and logical thought processes; a full and appropriate affect; and good insight and judgment (Tr. 226). Dr. Mouzon assessed her with a "severe" major depressive disorder, post traumatic stress disorder ("PTSD"), and social anxiety disorder; rated her global assessment of functioning ("GAF")[4] at 52; advised her to discontinue Cymbalta until her mood and anxiety were stable; and increased her Neurotonin (Tr. 225-26).

In December 2007, the plaintiff told Dr. Mouzon that the increase in Neurotonin helped reduce her pain "as long as [she] does not overdo things physically" (Tr. 227). The plaintiff also reported a significant decrease in headaches. On examination, she was depressed but alert, oriented, well-groomed, and cooperative, with a full, appropriate affect; normal rate, tone, and volume of speech; goal-directed and logical thought processes; intact memory; and good judgment, insight, and impulse control. Dr. Mouzon rated her GAF at 55 (Tr. 227). Dr. Mouzon also opined that the plaintiff was capable of handling funds in her own best interest (Tr. 224).

That same month, the plaintiff returned to Dr. Hanahan and reported pain in her upper back. Dr. Hanahan noted that she appeared distressed. Treatment notes do not reflect any examination findings related to her back (Tr. 233-34).

In January 2008, the plaintiff reported that, although her pain did not resolve completely, Neurotonin helped reduce it. On examination, she appeared depressed and disheveled but was alert, oriented, and cooperative, with an appropriate affect; normal rate, tone, and volume of speech; goal-directed and logical thought processes; intact memory; and fair judgment, insight, and impulse control. Dr. Mouzon rated her GAF at 54 and adjusted her medication (Tr. 268).

---

[4] GAF ranks psychological, social, and occupational functioning on a hypothetical contiuum of mental illness ranging from 0 to 100. A GAF rating of 51 to 60 indicates "moderate symptoms" or "moderate difficulty" in social or occupational functioning. *See* Ann. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (Text Rev. 4th ed. 2000).

Also during January 2008, the plaintiff stated that, during a typical day, she made a cup of coffee, took her medication, read, watched television, sat on the porch, and cared for her Chihuahua (Tr. 143-44). She talked on the phone about twice a week, occasionally did a load of laundry, and shopped for household items and prescriptions every other week. The plaintiff was able to pay bills, count change, handle a savings account, and use a checkbook (Tr. 143-50). While the plaintiff had previously alleged difficulty concentrating (Tr. 117), she now acknowledged that her ability to concentrate was not impacted by her impairments (Tr. 148).

In February 2008, the plaintiff reported that she was experiencing diarrhea as a side effect of a recent increase in Neurotonin (Tr. 267). On examination, she appeared depressed but was alert, oriented, cooperative, and well-groomed, with an appropriate affect; normal rate, tone, and volume of speech; goal-directed and logical thought processes; intact memory; and good judgment, insight, and impulse control. Dr. Mouzon rated her GAF at 55 (Tr. 267).

In March 2008, Dr. Mouzon observed that the plaintiff appeared disheveled but had good judgment, insight, and impulse control. Her examination findings remained the same. The plaintiff reported that her stomach symptoms had improved since she stopped taking Neurotonin. Dr. Mouzon rated her GAF at 56 (Tr. 266). Imaging of the plaintiff's right wrist and shoulder was within normal limits (Tr. 341).

In April 2008, the plaintiff presented to Daniel Holden, M.D., and reported neck, back, right arm, hand, hip, and leg pain. On examination, she walked with an antalgic gait and had tenderness in her back and neck and muscle spasms in her lower back, but normal flexion in her neck; normal range of motion in her lower back; normal abduction in her shoulder; normal extension in her wrist; normal flexion in her hip; and normal flexion and extension in her ankles. Dr. Holdon assessed her with chronic pain, fibromyalgia, osteoarthritis, and rheumatoid arthritis (Tr. 330-33).

10

Later that month, Dr. Mouzon observed that the plaintiff had a "flat" mood but was alert, oriented, cooperative, and well-groomed, with an appropriate affect; normal rate, tone, and volume of speech; goal-directed and logical thought processes; intact memory; and good judgment, insight, and impulse control.  Dr. Mouzon rated her GAF at 59 and adjusted her medication (Tr. 265).  Dr. Hanahan observed that the plaintiff appeared anxious but healthy and deferred a physical examination (Tr. 300-01).

Dr. Hanahan continued to treat the plaintiff in May, June, July, and August 2008; however, he did not make any physical examination findings (Tr. 291-93, 296).

In July 2008, Dr. Hanahan completed a form opining (among other things) that the plaintiff had cervical spondylosis, fibromyalgia, and depression; that she was incapable of even "low stress" jobs; that she could sit and stand/walk for a total of less than two hours each in an eight-hour day; and that she could rarely carry less than 10 pounds and never carry 10 pounds or more (Tr. 269-72).  That same month, Dr. Mouzon completed a form opining that the plaintiff had major depressive disorder, PTSD, and social phobia, and that she would miss about four days of work per month due to her impairments (Tr. 273-76).

In October 2008, the plaintiff told Dr. Hanahan that she was feeling a little better, with less pain and an improved mood.  On examination, the plaintiff appeared comfortable and had a supple neck (Tr. 288-89).

In January 2009, the plaintiff reported anxiety, especially "when pain exacerbated." (Tr. 285).  The following month, Dr. Hanahan observed that the plaintiff appeared relaxed (Tr. 280-82).

During the administrative proceedings, State agency doctors Dale Van Slooten, M.D., Carl Anderson, M.D., and Manjit Sihota, M.D., reviewed the record and opined that the plaintiff's physical impairments were not "severe" under Social Security regulations (Tr. 52, 54, 205, 235, 261).  State agency psychologist Debra Price, Ph.D., reviewed the record and opined that the plaintiff did not have severe mental impairments

11

(Tr. 207-20).   However, subsequent to Dr. Price's review, State agency psychologists Xanthia Harkness, Ph.D., and Larry Kravitz, Psy.D., reviewed the record and opined that the plaintiff had severe major depressive disorder, social anxiety, and PTSD, but that she retained the residual functional capacity ("RFC") to perform unskilled work as long as she was not in constant contact with the general public (Tr. 237-61).

The plaintiff was represented by counsel during the July 2009 administrative hearing (Tr. 21).  The plaintiff acknowledged that she stopped working in 2004 for reasons other than her allegedly disabling impairments.  She asserted that she was presently unable to work due to fibromyalgia, rheumatoid arthritis, and osteoarthritis (Tr. 25, 28-29).  The plaintiff reported "stabbing pains" due to fibromyalgia, daily headaches, and wrist pain when picking up objects or opening doors (Tr. 31, 40, 43).  The plaintiff took Lortab, which she said did not end her pain completely but "t[ook] the edge off."  The plaintiff said that Lortab and Lyrica together were "pretty good," but that she stopped taking Lyrica due to weight gain (Tr. 29-30).  The plaintiff wore a wrist brace, which she bought at Wal-Mart (Tr. 40, 42).  At the time of the hearing, the plaintiff did not take any medication (including over-the-counter medication) for her headaches (Tr. 43).  She had never presented to a hospital with a migraine headache (Tr. 44).

With regard to depression, anxiety, and PTSD, the plaintiff took anti-depressant medication (Zoloft) and anti-anxiety medication (Buspar), which she said helped "[s]omewhat" (Tr. 31-32).  The plaintiff reportedly had not seen Dr. Mouzon in six to eight months (due to financial issues) and was not attending therapy (Tr. 31, 41).

With regard to her functional abilities, the plaintiff estimated that she could stand or walk for two or three minutes at a time, sit for about 15 minutes at a time, and lift up to four or five pounds.  She said her mental impairments affected her ability to be in public and to deal with co-workers (Tr. 33-35).  The plaintiff dressed herself (although she said it took "a little while"), performed her own self care (although she said she used a bath

12

chair), watched television, drove, cared for her Chihuahua, prepared at least simple meals, and helped fold laundry ("[e]very once in a while") (Tr. 36-38, 42). She said she spent most of the day sitting in a recliner and used a buggy when shopping at Wal-Mart (Tr. 35, 39). The plaintiff reportedly had one friend, whom she spoke with once a month (Tr. 35). "Every once in a while," she went out to eat or took her son to work (Tr. 35-37).

Vocational expert Kathleen Robbins, Ph.D., testified in response to a series of hypothetical questions, one of which concerned an individual of the plaintiff's age, education, and work history who was able to lift 20 pounds occasionally and 10 pounds frequently; sit and stand/walk for six hours each in an eight-hour day (with normal breaks); occasionally climb ladders, ropes and scaffolds; frequently balance, stoop, crouch, crawl, kneel, and climb ramps and stairs; and perform simple, routine, repetitive tasks with occasional public interaction (Tr. 77). The expert testified that the hypothetical individual could perform work that exists in significant numbers in the national economy, including the unskilled light jobs of main or house cleaner (4,000 jobs regionally, 240,000 jobs nationally); office helper (3,500 jobs regionally and 273,000 jobs nationally); and packer (6,000 jobs regionally and 400,000 jobs nationally) (Tr. 47).

## **ANALYSIS**

The plaintiff alleges disability commencing March 20, 2006, at which time she was 43 years old. She was 46 years old on the date last insured (Tr. 18). The ALJ found the plaintiff had the following severe impairments:  rheumatoid arthritis, osteoarthritis, disorders of the cervical spine, fibromyalgia, depression, anxiety, and PTSD (Tr. 13). The ALJ further found the plaintiff could perform less than a full range of unskilled light work and could not perform her past relevant work as a cashier, machine operator, loom cleaner, and blanket packer (Tr. 15-18). However, the ALJ determined the plaintiff could perform jobs that exist in significant numbers in the national economy (Tr. 18-19). The plaintiff argues that the ALJ erred by (1) failing to properly consider the opinions of her treating physicians;

13

(2) relying on the opinions of a non-examining physician and psychologist when such opinions were not based on a review of the entire record; and (3) failing to properly consider her subjective complaints.

### *Treating Physician*

The plaintiff argues that the ALJ failed to properly consider the opinions of Drs. Mouzon and Hanahan. The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions

14

are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

In July 2008, Dr. Hanahan completed a form opining that the plaintiff had cervical spondylosis, fibromyalgia, and depression; that she was incapable of even "low stress" jobs; that she could sit and stand/walk for a total of less than two hours each in an eight-hour day; and that she could rarely carry less than 10 pounds and never carry 10 pounds or more (Tr. 269-72).

The ALJ stated as follows with regard to Dr. Hanahan's opinion:

I . . . give little weight to Dr. Hanahan's opinions. Exhibit 17F. Dr. Hanahan reported his assessment based, in part, on chronic fatigue, numbness and tingling, breathlessness, panic attacks, and vestibular dysfunction. However, such are reported infrequently in treatment notes. Additionally, Dr. Hanahan reported claimant's pain and symptoms would constantly interfere with her ability to perform simple work tasks. However, claimant reported her ability to pay attention was not affected by her conditions. Exhibit 8E. Furthermore, Dr. Hanahan based his assessment that claimant was incapable of performing low stress jobs on claimant's subjective report that housework provoked her pain rather than objective findings. Dr. Hanahan's assessment is simply not well-supported by objective findings in the record.

(Tr. 17).

Also in July 2008, Dr. Mouzon completed a form opining that the plaintiff had major depressive disorder, PTSD, and social phobia, and that she would miss about four days of work per month due to her impairments. Dr. Mouzon further opined that the plaintiff had moderate restriction of activities of daily living, marked difficulties in maintaining social functioning, marked deficiencies of concentration, persistence, or pace, and one or two episodes of decompensation within a 12 month period (Tr. 273-76).

15

The ALJ found as follows with regard to Dr. Mouzon's opinion:

I give little weight to the opinions of Jacquelyn Mouzon, MD. Exhibit 18F. In contrast to the severely limited individual Dr. Mouzon described, mental health treatment notes report generally normal mental status examinations (Exhibits 6F and 16F). Additionally, Dr. Mouzon reported she based her assessment, in part, on claimant's low appetite, problems sleeping, and difficulty concentrating. However, mental health treatment notes report claimant's appetite and sleep were "fair" or "good" (Exhibits 6F and 16F), claimant herself stated no problems in attention resulted from her conditions(Exhibit 8E), and treatment notes report claimant was attentive (Exhibit 6F, Page 4).

(Tr. 17).

This court finds that the ALJ reasonably evaluated the opinions of these treating physicians. The ALJ discounted Dr. Hanahan's July 2008 opinion regarding extreme limitations in functioning in part on the grounds that it appeared to be based upon the plaintiff's subjective reports, rather than clinical findings or objective testing. Indeed, Dr. Hanahan's notes contain minimal examination findings. When he did record examination findings, Dr. Hanahan often observed that the plaintiff was in no acute distress, that she had normal cognition, that her osteoarthritis was stable, and that she had normal range of motion in her back, neck, and legs (Tr. 191, 199-200, 203-04, 222, 288). While Dr. Hanahan one time found trigger point tenderness consistent with fibromyalgia (Tr. 222), physical examinations show that the plaintiff did not have functional limitations from fibromyalgia (or any other impairment) that would preclude her from performing a reduced range of unskilled light work (Tr. 17-18; *see, e.g.*, Tr. 203, 355). The ALJ further noted that Dr. Hanahan's opinion was based in part on chronic fatigue, numbness and tingling, breathlessness, panic attacks, and vestibular dysfunction, but these were reported infrequently in treatment notes (Tr. 17). *See Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding an ALJ reasonably rejected a treating physician's opinion where the opinion was not supported by the physician's own treatment notes). The ALJ also noted (Tr. 17)

16

that while Dr. Hanahan opined in July 2008 that the plaintiff's pain and symptoms would constantly interfere with the attention and concentration needed to perform simple work tasks (Tr. 270), the plaintiff herself stated in January 2008 that her attention was not impacted by her conditions (Tr. 148).

The ALJ also reasonably found that Dr. Mouzon's opinion regarding extreme limitations in functioning was not supported by her own treatment notes, which report generally normal mental status examinations (Tr. 17). For instance, while Dr. Mouzon observed that the plaintiff was depressed, she also consistently observed that the plaintiff was alert and fully oriented, with fair-to-good insight and judgment, normal speech, rate, tone, and volume; goal directed and logical thought processes; intact memory; and an appropriate affect (Tr. 226-27, 265-68). Moreover, the plaintiff's other treatment providers observed that she was alert and fully oriented, with normal cognition, intact thought processes, and adequate attention, concentration, and memory (Tr. 15, 17; *see* Tr. 191, 193, 197, 200, 355). The ALJ also noted that while Dr. Mouzon found the plaintiff had marked deficiencies of concentration, persistence, or pace, the plaintiff acknowledged in January 2008 that her ability to concentrate was not impacted by her impairments (Tr. 17; *see* Tr. 148). As argued by the Commissioner, this evidence is inconsistent with Dr. Mouzon's opinion regarding extreme limitations in functioning, but it is consistent with the ALJ's determination that the plaintiff retained the ability to perform simple, routine, repetitive tasks with occasional public interaction. *See* 20 C.F.R. §§ 404.1527(d)(3) (supportability), 404.1527(d)(4) (consistency with the record as a whole); *Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004) (finding an ALJ reasonably discounted a treating physician's opinion where no other treating physician consistently observed limitations as severe as those described); *Craig*, 76 F.3d at 590 (finding an ALJ reasonably rejected a treating physician's opinion where the opinion was not supported by the physician's own treatment notes). This court agrees with the Commissioner that the ALJ reasonably discounted Dr. Mouzon's

17

opinion and reasonably found that the plaintiff retained the ability to perform a reduced range of unskilled work—the least complex type of work. *See* SSR 82-41, 1982 WL 31389, at *2 (stating unskilled work is the least complex type of work).

### State Agency Psychological Consultants

The plaintiff next argues that the ALJ erred in giving weight (Tr. 17) to the opinions of State Agency psychological consultants Drs. Kravitz and Harkness, both of whom reviewed the record and opined that the plaintiff had severe major depressive disorder, social anxiety, and PTSD, but that she retained the RFC to perform unskilled work as long as she was not in constant contact with the public (Tr. 251-55; 259-60).  An ALJ must consider the findings of a State agency psychological consultant because such consultants "are highly qualified . . . psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. §404.1527(f)(2)(i).  The Fourth Circuit Court of Appeals has recognized that an ALJ may rely upon a non-examining psychologist's opinion where the opinion is consistent with evidence in the record. *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984).

As argued by the Commissioner, these opinions were consistent with evidence in the record that the plaintiff was alert and fully oriented with fair-to-good insight and judgment; normal speech, rate, tone, and volume; goal-directed and logical thought processes; intact memory; and appropriate affect; and normal cognition (Tr. 15, 17; *see* Tr. 191, 193, 197, 200, 226-27, 256-58, 355).  The plaintiff argues that the ALJ should not have given weight to the evaluations because Drs. Kravitz and Harkness did not consider evidence in the record that was submitted after their February and March 2008 opinions (pl. brief at 14-15).   While the State agency psychological consultants did not have an opportunity to see this later added evidence, much of it also supports their findings (*see* Tr. 265-68 (finding the plaintiff was alert and fully oriented with fair-to-good insight and judgment; normal speech, rate, tone, and volume; goal-directed and logical thought

18

processes; intact memory; and appropriate affect; and normal cognition); 288, 293 (mood improved); 291 ("depression a bit better").  Further, much of the evidence cited by the plaintiff (pl. brief at 15) does not relate to the disability period at issue (*see* Tr. 302-29; 357-98).  Furthermore, while the psychological consultants did not have the evaluations of Drs. Hanahan and Mouzon to review (Tr. 269-72, 273-76), they did have many of their treatment notes (Tr. 178-204; 221-22; 223-27; 228-34).  Based upon the foregoing, the ALJ did not err in giving these opinions weight.

### Subjective Complaints

The plaintiff further argues that the ALJ erred in evaluating her credibility (pl. brief at 10-14).  The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig*, 76 F.3d at 593, 595.  A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996

WL 374186, at *4.  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

> (1)  the individual's daily activities;
>
> (2)  the location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> (3)  factors that precipitate and aggravate the symptoms;
>
> (4)  the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> (5)  treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> (6)  any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> (7)  any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

The ALJ found that while the plaintiff's impairments could reasonably be expected to cause the alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment (Tr. 17).  In evaluating the plaintiff's subjective statements, the ALJ noted a number of inconsistencies (Tr. 16).  For instance, the ALJ correctly observed that although the plaintiff asserted that she experienced sleepiness and dizziness from her medications, care providers repeatedly observed that she was alert and oriented with normal cognition, and dizziness was rarely reported (Tr. 16; *compare* Tr. 41

20

*with* Tr. 191, 193, 197, 200, 226-27, 265-68, 355).  While the plaintiff initially alleged difficulty concentrating, she later acknowledged that her ability to concentrate was not impacted by her impairments (Tr. 17 ("claimant reported more substantial abilities in her later Functional Report (Exhibits 8E) tha[n] she did in an earlier one (Exhibit 3E)."); *compare* Tr. 117 *with* Tr. 148).  Further, while the plaintiff asserted that she could not reach down to pick something up, she later acknowledged that she put food down for her Chihuahua (while her husband cared for the other family pets) (Tr. 16; *compare* Tr. 100 *with* Tr. 37, 144).  She also testified that she could only lift 4 or 5 pounds, but on examination she had basically normal strength in her upper extremities (Tr. 16; *compare* Tr. 34 *with* Tr. 354-55).  The plaintiff also made inconsistent statements about the reason she stopped working, initially asserting that she stopped working due to "trouble w/ depression" (Tr. 100), but later testifying that she stopped working for reasons other than her allegedly disabling impairments (Tr. 28-29; *see also* Tr. 25).

These inconsistencies provide valid bases for finding the plaintiff's subjective statements were not credible. *See* 20 C.F.R. § 404.1529(c)(4) (stating an ALJ must consider whether there are any inconsistencies in the evidence); *Craig*, 76 F.3d at 595 (recognizing a claimant's subjective statements need not be accepted to the extent that they are inconsistent with the available evidence); *Dixon v. Sullivan*, 905 F.2d 237, 238-39 (8th Cir. 1990) (finding it significant that the claimant left her employment for reasons other than her disability).

The ALJ also reasonably found the objective medical evidence did not support the plaintiff's allegations of disabling limitations (Tr. 16-17). *See* SSR 96-7p, 1996 WL 374186, at *6-7 (stating an ALJ may consider the objective medical evidence); *Craig*, 76 F.3d at 595 (recognizing that, while a claimant's allegations may not be discredited solely because they are not substantiated by objective evidence of the pain itself, they need not be accepted to the extent they are inconsistent with the available evidence, including the

21

objective medical evidence).  For instance, although the plaintiff alleged disabling rheumatoid arthritis and osteoarthritis (in addition to fibromyalgia), the record showed that she had essentially normal range of motion in her neck, back, shoulders, elbows, and wrists, and x-rays of her shoulder and wrist were unremarkable (Tr. 16-17; *compare* Tr. 29, 101 *with* Tr. 204, 331, 355).  The ALJ further noted that the plaintiff had received only conservative treatment for her impairments (Tr. 17). *See* 20 C.F.R. § 404.1529(c)(3) (stating an ALJ must consider the type of treatment a claimant has received).

The plaintiff argues that the evidence could be read differently (pl. brief at 10-14).  However, on substantial evidence review, the court does not "re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589 (citation omitted).  Based upon the foregoing, this court finds that the ALJ properly considered the plaintiff's subjective complaints, and the credibility finding is based upon substantial evidence.

### CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

November 29, 2011
Greenville, South Carolina

22